## THE NEW-JERSEY RAIL ROAD AND TRANSPORTATION COMPANY v. ABRAHAM SUYDAM.

On *Certiorari* to the Clerk of Middlesex county, to return the proceedings of Commissioners on assessing damages to landholders, &c.

An award of such Commissioners, assessing damages for running, making and maintaining fences, without *shewing*, that the lands of the party, through which the road is run, are *improved* lands, is illegal and void. The charter authorizing such damages in case only of improved land.

The rule is well settled that persons exercising a special delegated authority, must show upon the face of their proceedings, that they have acted within their prescribed limits.

This Court will set aside the proceeding of such Commissioners, if they have adopted and acted upon illegal principles in making their valuation of land, and assessment of damages. To ascertain which fact, affidavits may be taken and read before this Court, on a *Certiorari*, although the merits of the case may not be inquired into.

When the principle of valuation is ascertained, this Court is judicially to determine, not whether the assessment made thereon, was too much or too little, but whether the principle or rule was a lawful or unlawful one.

A *Certiorari* lies in all cases unless taken away by express words of a statute; and not only where there is no other remedy, but even where an appeal is given upon the merits.

*J. P. Jackson and I. H. Williamson*, for plaintiffs.
*J. W. Scott and P. D. Vroom*, for defendant.

*J. P. Jackson for plaintiffs*, insists that the award in this case was grossly extravagant, oppressive and unjust; was made on erroneous principles, and should be set aside.

The plaintiffs must establish three positions, to entitle them to relief.

I. The jurisdiction of the Court.

II. Its right to vacate this award, if palpable injustice has been done, or if made on erroneous principles.

III. That these objections to this award, are well founded in fact.

I. This is the only tribunal that can give relief in the present matter, and there can be no wrong without a remedy; *Coxe Rep.* 247, 248, 251. A Court of Chancery cannot interfere, it appertains to the general supervisory jurisdiction of the Supreme

Court. *Sax. C. R.* 277; 4 *John. C. R.* 356; 15 *John. R.* 538; 2 *Caines*, 181; 16 *John. R.* 50.

The authority of this Court to inspect the proceedings of Inferior tribunals, especially of statutory jurisdiction, exists in full vigor. 1 *Green*, 98; 2 *Id.* 39. No appeal is granted to the plaintiffs by their charter, (see 6th *sec.*) their only redress is by *Certiorari* at common law. This remedy cannot be denied, for "nothing short of express words, will deprive this Court of jurisdiction." 3 *Green*, 322.

Justice Baldwin in Circuit Court United States, in a parallel case, laid down the law, that "so far as respects the legal objections to the assessment, which were the grounds of the *Certiorari*, they are properly cognizable in the Supreme Court of this State, in virtue of its general supervisory jurisdiction, *over all inferior jurisdictions proceeding in a summary way; and over all commissioners and officers, appointed to execute a trust or power, general or special.* This general superintending control, has not been taken away or impaired, in cases of the present description.

II. This court have a right to examine the award, and set it aside, if *palpable injustice* has been done, or if made on *erroneous principles;* 8 *Wend.* 47; 10 *Wend.* 168, 179; 16 *John.* 49; 20 *John.* 432.

Let it be established that there is no relief from exorbitant and oppressive assessments, and the commissioners would be clothed with despotic power. They could render inoperative any grant of the Legislature, and arrest the construction of any public work. Suppose an award of $100,000 for lands not worth $100; would not the fact itself, be evidence of erroneous principles of valuation, and that palpable injustice has been done? It is the proof of such facts, that enables the Court to perceive the erroneous principles of law, which governed the Commissioners. It is the flagrancy and enormity of the result, that makes the principles by which it is attained, illegal and unjust. In such a case, Commissioners exceed their powers, and their acts will be set aside, but the facts can only be ascertained, by examining witnesses to discover the truth of the complaints. 8 *Wend.* 63, 64; 2 *Caines R.* 182.

III. The facts show the amount awarded to have been so ex-

New-Jersey Rail Road and Tr. Co. v. Suydam.

cessive and disproportionate, as to produce conviction, that erroneous principles of valuation were employed, and that palpable injustice has been done.

It appears that $5,800, was awarded for fifty-one hundredths of an acre, being the 1-13 part of a tract, that was purchased by defendant, two years before, in the very height of speculation, for eight thousand dollars ; thus at the rate of the assessment, the whole would amount to about seventy-five thousand dollars.

The witnesses for the parties, are about equal in number. The plaintiffs' witnesses all estimate the land by the acre prices, at from one hundred dollars to one hundred and fifty dollars per acre, and that the damages should not exceed one thousand dollars, the full value of the whole tract.

The defendant's witnesses, by the aid of lithographic maps, convert the whole tract into building lots, and make various estimates of the value of these lots, per foot. By adding up their detailed valuations per foot, the aggregate results attained, show a wide discrepancy. These amounts vary from nineteen thousand two hundred and twenty-one dollars, to fifty-four thousand one hundred and ninety-seven dollars and a half, and yet the first witness fixes the amount for the fifty-one hundredth of an acre at five thousand eight hundred dollars, while the latter with a sum for the whole, nearly three times as large, makes his estimate at five thousand five hundred dollars. So too, the witnesses of defendant, notwithstanding the large aggregate amounts, to which a computation of their valuation by the foot, brings them, when cross examined, fix the gross value of the tract at but from eight thousand dollars to fifteen thousand dollars ; but even that is mere opinion, and no facts are stated to justify such a conclusion. The only fact we have to ascertain its true value, is the price at which it was sold to the defendant, being the only offer ever made for it, after it had laid in waste for fifteen or twenty years ; which, as stated, was eight thousand dollars, a sum largely disproportionate to its real or productive value.

The defendant justifies the proceedings of the Commissioners, by the views of valuation adopted by his witnesses, which however honestly entertained, are too speculative, and fanciful, and founded too much on mere opinion, and prospective demand for

city lots in the suburbs of New Brunswick, to form the basis of a correct award.

It is plain then that the Commissioners have employed erroneous principles to attain their results, and the award itself is most signal evidence that erroneous principles have produced it. Correct principles always produce correct results, erroneous results are the offspring of erroneous principles; their relation to each other is unchangeable.

A speculative and inflated, and therefore an illegal and unjust principle of valuation, has been adopted by the Commissioners, converting a barren common, into city lots, and attaching a prospective, future, suppositious value to them. Instead of the "just compensation," properly secured by the Constitution of the United States, a most exorbitant and disproportionate sum of money, is sought to be drawn from the proprietors of an important public work, by a landholder, who purchased with a knowledge of the location of the rail road, and doubtless with a view to the anticipated benefits, which this very tract itself, would receive from its construction.

HORNBLOWER, C. J. By the 6th section of the act incorporating the New Jersey Railroad and Transportation Company, it is provided, that in case of disagreement, as to price, between the Company and the landholder, it shall be the duty of one of the Justices of this Court, upon the application of either party, to appoint three Commissioners to *determine* " the *compensation* and *damages*, which the owner of the real estate or land, has sustained, by reason of the occupancy thereof by the said corporation."

Such is the awkward language of the statute; the meaning of which, I apprehend to be, that the Commissioners shall determine the value of the land taken by the company, for the construction of the road, and the damages the land holder may sustain, by reason of having the road made across his land. The statute further directs that the Commissioners shall assess the damages, which any individual may sustain by the said road, " arising from the removing, making and maintaining, the fencing, on the line of the route, of said road, through any *improved* lands, over which the same may run :" and the Commissioners

are to deliver to the Company, " a written statement signed by them, or a majority of them, of the *awards* they shall make, containing a description of the lands, together with the amount of assessment for running, making and maintaining the fencing; to be recorded by the Corporation, in the Clerk's Office, &c." The act then declares that upon payment or tender of such compensation, to the owner of the land, or, under certain circumstances, on payment thereof into the Court of Chancery, the Company shall be deemed seized and possessed in fee simple, of such land.

In this case, Commissioners were appointed upon the application of the Company. Two of them, (the other dissenting) have awarded to Mr. Suydam, the landholder, the sum of five thousand eight hundred dollars, for the land taken by the Company, the damages done to him, by making the road through his lands, and for running, making and maintaining the fence on the line of the road where the same crosses the lands of the defendant. The Commissioners have not made two awards; so much for the value of the land and damages; and so much for making and maintaining fence; but they have awarded the aggregate sum of five thousand eight hundred dollars, to be paid by the Company to Mr. Suydam; which they say, includes the sum of one hundred and two dollars, assessed by them for running, making and maintaining the fence, &c. It appears upon the face of the award, that the Company occupied fifty-one hundredths of an acre of land belonging to the defendant, which from the evidence and exhibits in the cause, is part of an entire tract, or rather of two parcels of land, lying contiguous to each other, separated only by a street or highway, containing in the whole, six and a half acres. So that deducting the one hundred and two dollars from the five thousand eight hundred dollars, it appears that the Commissioners have allowed Mr. Suydam five thousand six hundred and ninety-eight dollars, for fifty-one hundredths of an acre of land, taken by the Company for their use.

The Company being dissatisfied with this award, by leave of this Court, sued out a writ of *Certiorari* to the Clerk of the county of Middlesex, directing him to send up and certify to us, the record and proceedings aforesaid, to the end that the same might be set aside if any error therein hath intervened.

Among several objections apparent on the face of this record, there is only one which I shall notice. It is this. That the Commissioners have assessed damages for running, making and maintaining fence, without shewing that the lands of the defendant, through which the road runs are *improved* lands.

If they are not *improved* lands, (whatever that expression may mean) the Commissioners have exceeded their authority : they have gone beyond their jurisdiction, and their proceedings, so far at least, as relates to that matter, are illegal and void.

It is no answer to this objection, to say, nor even to prove by evidence dehors the record, that the lands in question were *improved* lands. The fact may be, and probably is so, but it must appear on the face of the award, or else the record will be incomplete. We cannot put such supplementary evidence on the record in the Clerk's Office, and thus patch up the award and sustain the jurisdiction of the Commissioners. The rule, I apprehend to be clear and well settled, that persons exercising a special delegated authority, must show upon the face of their proceedings, that they have acted within their prescribed limit. In *Rex* v. *Inhabitants of Audley ;* 2 *Salk.* 526, Holt, Chief Justice says, as Twisden, Justice, had said before him, " if a particular jurisdiction does not show the matter to be within its authority, it must be taken to be without it." The case of the *King* v. *Croke, Cowp.* 26, decided in 1774, is a direct authority on this point. By 9 *Geo.* 3, power was given to the Mayor, Aldermen, &c. to treat for the purchase of certain lands, for the construction of a highway, and in case of disagreement, then the Quarter Sessions, upon the application of the Mayor, &c. and upon fourteen days previous notice in writing, given to the landholder, were to summon a jury to assess the value of the land. The Corporation being unable to agree with the person owning, or interested in the land, a jury was empanelled, and an assessment made. Whereupon the Quarter Sessions made an order, stating that " upon application being made, &c. by the Mayor, *commonalty,* and citizens of &c., and *upon proof on oath, of due notice having been given,* &c." This proceeding was removed by *Certiorari* into the Kings Bench, and it was objected among other things. 1st. That it did not appear in the order of Sessions, that the Mayor, *Aldermen and Common Council in*

*Common Council assembled,* had *adjudged* the lands in question to be necessary, &c. and 2dly. That it was stated in the order, that the application had been made by the Mayor, commonalty, &c. instead of the Mayor, *Aldermen,* &c. Both of these objections were sustained by the whole Court. Lord Mansfield said, "this is a special authority, delegated by act of Parliament, to particular persons, to take away a man's property and estate, against his will; therefore it must be strictly pursued, *and must appear to be so upon the face of the order.*" As to the mistake in the name of the corporation, his Lordship said, they could not go into facts, to show that in truth, the Mayor, *commonalty,* and citizens were the proper persons to make the application; and then stated as a fatal objection, a matter which had not been noticed at the bar; namely, that the order did not state that fourteen days notice in writing, had been given to the party, but only said "*upon proof of due notice,*" &c. which he held to be insufficient. Aston, Justice, said that "the notice required by the statute, ought to have been fully set out, and precisely pursued," and he added, *that the defect was not cured by the defendant's appearance.*

The case of *Rex* v. *Manning,* 1 *Burr,* 377, is to the same effect. The Court held, that the existence of the particular circumstances, which gave authority to the Sessions, if not in the form of express and direct adjudication, *ought, in some way, to appear on the face of the record.* So too in the case of *The King* v. *The Mayor &c. of Liverpool,* 4 *Burr,* 2244, the rule is stated that, *it must appear upon the face of the* proceedings, *that those particular facts or circumstances, exist, upon the existence of which, jurisdiction in the matter, is given to the special jurisdiction.* In *Starr* v. *The Trustees, &c.* 6 *Wend. R.* 564, the Supreme Court of New York carried out this principle, to the full extent. The Trustees had power to widen streets, provided they did not interfere with any building, the costs of removing which, should exceed one hundred dollars. It was held that the record of their proceeding, ought to show, that they had acted in a case, in which they had jurisdiction; and therefore it was not sufficient for them to state that the owner of the building had consented to the removing of it, but they ought to have stated, that the expense of removing the building, would not exceed one hundred dollars; that being

the fact, which gave them jurisdiction, where a building was to be removed. The same doctrine has been reiterated from this Bench. *The State* v. *Scott*, 4 *Halst. R.* 17; *The State* v. *Van Geisen*, 3 *Green's R.* 339; *The State* v. *Shreeve*, 3 *Green's R.* 57.

This objection however, will not be fatal to the whole award, if the Commissioners have not so blended the two assessments, that they cannot be separated. There are many cases upon *Certiorari*, in which the Court may reverse in part, and affirm the residue. An order of removal of two or more persons, may be considered as so many distinct orders; and if either is illegal, it may be quashed as to that, and the others affirmed. But when the several parts of the proceedings are connected together, and depend on each other, so that one part cannot be quashed, without leaving the other incomplete, or more extensive than it should be, the whole must be set aside. 3 *Amer. Com. Law,* *tit. cert. letter G. fol.* 134; 5 *Mass. R.* 420; 3 *Id.* 268; *Rex.* v. *Inhabitants of Madley,* 2 *Str.* 1198; *Robinson* v. *Hedges, Penn. R.* 688; *and Hay* v. *Imley, Id.* 832.

In this case, the Commissioners have awarded an entire sum, viz: five thousand eight hundred dollars, for the land and damages thereto, and for the fencing: they afterwards, it is true, inform us, that one hundred and two dollars of that sum, was for the expense of making and maintaining the fences: I do not clearly perceive how by setting aside so much of this award as relates to the fencing, we can correct this error. We can indeed mentally deduct the one hundred and two dollars from the total amount, and ascertain the balance; but we cannot make the record read as it should do, without using the pen; which we have no right to do. If we reverse so much of the award as relates to the fence, the award will still read five thousand eight hundred dollars for the land, &c.

After all, if there was no objection to this award, more vitally affecting the justice of the case, than this, I should be inclined to reverse only so much of the proceedings, as relates to the fencing, and affirm the residue.

But there is another more serious and substantial objection, urged against this award. It is that the Commissioners have adopted and acted upon illegal principles, in making their valuation of the land, and assessment of the damages.

New-Jersey Rail Road and Tr. Co. v. Suydam.

If any thing has been done by a special delegated power, in an unlawful manner, or beyond, or in violation of the trusts, and authority vested in them ; or contrary to the true intent and spirit of the legislation, by which that power was delegated ; or in contravention of the object and design of the law, their proceedings ought to be anulled and set aside.   This position was not controverted on the argument; but it was insisted, that a *Certiorari* does not lie in any case, to try the merits ; and that therefore the Court could not hear affidavits touching the value of the land, or going to shew that the Commissioners have given too much or too little.    In support of this doctrine, a number of authorities were cited.    But a reference to authorities was not necessary to convince me that upon *Certiorari*, we have no right to review the merits of the case, or to receive evidence simply to ascertain whether the Commissioners have judged discreetly, or whether they have given too much or too little ; nor did I understand that the affidavits were offered to the Court for that purpose.   The object of the plaintiffs, was by means of affidavits regularly taken in this cause, to bring to the knowledge of the Court, the location, character and condition of the land, and the generally estimated value of the whole tract, to the end that the Court might, if practicable, ascertain the rule or principle of valuation upon which the Commissioners had acted in making an appraisement, by which they have allowed the defendant, five thousand six hundred and ninety-eight dollars for about half an acre of land, and the damages done by the Rail Road to his property.

Now it will be admitted that whether the Commissioners understood the extent of their powers, and the duties imposed upon them ; and whether in exercising those powers, and discharging those duties, they were governed by *any* rule or principle of action ; and if by any, then by what rule or principle of action they were governed, are questions of fact ; and they are facts, which the plaintiffs have a right to prove if they can.   And when the principle of valuation or rule of action upon which the Commissioners acted, is ascertained, this Court is judicially to determine, not whether the assessment made upon those principles, was too much or too little ; but whether the principle or rule of action itself, was a lawful or unlawful one.

It may indeed be more difficult to get at the secret operations of the minds of the Commissioners, and to find out the principle or rule of action, under the influence of which, they acted, than to prove mere matters of fact, relating to time, place and persons: but it is no less the right of the party to do the one, when it can be reached, than it is to do the other; nor is it less the duty or within the rightful power of this Court, to judge of the legality of those principles, when once they are ascertained, than it is to judge of any other question of law.

The Legislature of this State, have thought proper by the agency of instrumentality of a chartered Company, to construct a Rail Road from Jersey City to New Brunswick. Whether in doing so, they have acted in derogation of private rights, or have endangered public liberty, are questions that do not belong to us, so long as the law is constitutional in its provisions. The legislature then, have manifested their intention that this road should be made, and to secure its completion, it has provided, that if the company and any landholder could not agree upon the price of the land, it should be ascertained by Commissioners appointed for the purpose, in the manner in which these were appointed. But in fixing this price, they are not to act *ad libitum*, this will not be pretended. They are " to *discharge the trust reposed in them*," according to some rule, and form their judgment and determination upon correct legal principles. To deny this, is to place these Commissioners where nobody else in this country is placed: above law, and beyond accountability. What then is that rule, that just and legal principle by which Commissioners in this case should be governed? I answer, the value of the land taken, and a just compensation; a fair equivalent for the damages *done* to the landholder. If it is asked again, by what scale shall that compensation be measured? I answer by the standard of reason and common sense: for when they are outraged the one way or the other, the law is violated, and power has been misused or abused.

If for instance, Commissioners should allow a man for one quarter part of his land, whether for price, or damages, or both, more money than he himself admits and as every one else believes, the whole tract is worth, they manifestly violate reason and common sense, nay, they act without any rule of action at all,

and therefore act illegally. A part of a tract of land, cannot be worth more than the whole of it : nor can an injury to a thing, be greater than the destruction of the thing itself. These are self-evident propositions. If therefore, the Commissioners in this case, have allowed the defendant, such a sum for the half acre of land taken by the Company, as that one acre of it estimated at the same rate would cost as much, or more than the whole tract of six and a half acres is pretended to be worth, injustice has been done, the law violated, and the object and design of the Legislature defeated, unless indeed, the one acre so taken, should happen to constitute the whole value of the entire tract, of which, however, there is' no pretence in this case.

But how can the Court be ascertained of the fact, but by hearing evidence and examining surveys, showing the locality, quantity, character, value and condition of the land ? Unless such evidence is admitted, the injustice, however enormous, could never be reached by this Court, and this valuable and beneficial writ would fail to produce its salutary effect in all cases of this kind. Nay, if Commissioners, utterly reckless of all rules of justice and propriety, and determined to defeat the declared intention of the Legislature, should award fifty thousand dollars for a piece of land not worth five hundred dollars, we could not set aside the award, on the ground of presumptive fraud, or abuse of power, arising from the gross disproportion between the real value of the land, and the sum awarded, unless such evidence can be received ; for though we might happen individually to be acquainted with the land, yet without evidence of the location and value of the land, such disproportion could never be *judicially* taken notice of, and acted upon by the Court.

It only remains then, to inquire whether the evidence which has been exhibited before the Court, is sufficient to establish THE FACT, that the Commissioners have acted under the influence of illegal principles, or have made their award, upon any improper rule of assessment.

With a view to a correct answer to this question, I have carefully attended to the evidence, and made various calculations, the details of which, are too tedious to introduce here ; but their results are such as irresistibly to force conviction on my mind, that the Commissioners instead of giving the defendant a just

compensation for the *present* value of the land, have *fancied* it into building lots, for which the land is not now wanted, and probably will not be for many years; and then fixed upon it, a speculative and prospective value by the foot, wholly disproportioned to the present real, and substantial value of the premises. It is manifest that the Commissioners must have reached the result they did, by some such mode of calculation: or else, that they were governed by no principle at all.   When I speak of the evidence in this cause, I do not refer to the speculations and opinions of witnesses, but of the *facts*, that are proved, and they are the following, viz: The whole tract belonging to the defendant, and through which the Rail Road runs, contains six acres and a half: the quantity occupied by the Rail Road, is fifty-one hundredths of an acre, or in round numbers, *one* thirteenth part of the whole tract.   This land for more than twenty years, prior to the year 1836, had belonged to Staats Van Deuser; and during all that period or the greater portion of it, had been permitted to lie vacant and in common.   Until the year last mentioned, Mr. Van Deuser had never had an offer of any price for it: but in that year, after it was generally understood that the Rail Road would be located over this land, and at a period when the rage of speculation had run up to a fearful height, and when lands in and about the city of New Brunswick, were as high, if not higher than they had ever been before or have been since, Mr. Suydam purchased the entire tract of Mr. Van Deuser for eight thousand dollars.   It is further in evidence that there has been no demand for any part of this land, for building lots, since it was purchased by the defendant, nor has any of it been sold by him, (with the exception I believe of two or three lots) since he owned it; and that there is not now (and probably for many years to come, will not be) any demand for building lots so remote from the business part of the city, as this land is. These are matters of fact, and afford data which ought to have an influence in this cause.   If then we set down the entire tract at ten thousand dollars, we find that the Commissioners have awarded to the defendant, more than half that amount for only one-thirteenth part of it.   But if we suppose that the Commissioners estimated the fencing, and the damages to the residue of the land, at one thousand dollars that would leave four thousand

eight hundred dollars for one thirteenth part; at the same rate, four thirteenth parts, if so much had been taken, would have come to nineteen thousand two hundred dollars; thus giving for a little less than one quarter of the land, a sum far exceeding the largest estimated value of the whole of it; and at the same rate, swelling up the value of the whole tract, to the *enormous* sum of sixty-two thousand four hundred dollars! If then, the Commissioners did not go upon the future, prospective and speculative value of the land, as building lots, but considered its *present* value as land only, they have made an award, so enormous, so disproportionate, not to say, so outrageous, as to justify and call for a presumption of gross partiality and abuse of power, for which their proceedings ought to be set aside.   But if on the other hand, they have based their assessment upon a speculative and prospective value of the ground for building lots, when at some future, remote and uncertain period, the increasing population and prosperity of the city of New Brunswick shall bring it into demand for that use, they have certainly mistaken the law, which intends only to give the landholder, a just compensation for its present value.   Such a principle of valuation, would in some instances bid defiance to any capital, and put a VETO upon all public improvements; and in others, it would be most unjust and oppressive to the landholder himself; for if prospective increase of value is to be the rule in one case, so must future and probable decrease in value, be considered in another.

Upon the whole, from an inspection of the maps that have been exhibited, and an examination of the evidence on both sides, in connection with the quantity of land taken, and the amount awarded, it is plain that the Commissioners must either have valued the land at a price so exorbitant, as to call upon the Court to presume mistake, partiality or prejudice on the part of the Commissioners, or else that the Commissioners have factitiously converted the land into City Building Lots, and then valued them at speculative and prospective prices.   In either case, they have committed an error in principle, and acted contrary to law.

Here I desire to have it understood once for all, that when I speak of the award being so enormous, as to justify the Court in presuming partiality or fraud, I speak in legal language, and

do not intend to impute intentional injustice to the Commissioners. I use the terms only in a legal sense; in the same sense in which they are used by judges in relation to jurors, whose verdicts are set aside for excessive damages, and to whom, no actual fraud or bribery is thereby imputed.

The conclusion I have reached on this part of the case, is strengthened by the singular and striking fact, broadly stamped upon the evidence before us, that not one of the ten witnesses on the part of Mr. Suydam, gives any countenance or support to this award, except upon the principle of considering this land as laid out in building lots; and then fixing upon those lots, a price, per foot, at which they all admit, they could not *now* be sold; and which prices result in enormous sums of money for the whole land: varying according to the different estimates of the witnesses, from nineteen or twenty, to fifty or sixty thousand dollars. And yet not one of those witnesses values the whole tract, even if it was unaffected and uninjured by the Rail Road, at more than thirteen or fourteen thousand dollars.

Upon this and every other view I can take of the subject, I am satisfied, and feel bound, judicially to pronounce, that the Commissioners have exceeded their authority; or misused the power and trust reposed in them. Not, that they have simply given too much or too little; but that they have made their award upon fanciful and speculative, and therefore upon unlawful and erroneous principles.

I think too, the counsel who have argued this cause on both sides, and particularly on the part of the defendant, have taken too narrow and restricted views of the great principles and important consequences, involved in the case. They have argued the cause as if no one was interested in the result, but the parties on the record: Whereas, it is, in an important sense, a case of public interest, affecting the rights, the powers, and the *revenues* of the State. The plaintiffs are a public, not a private corporation. If they were the latter, a serious constitutional question might arise as to their right to take private property at all. They are for the purpose of making this great highway through the State, but the instruments, the *quasi* agents of the Government. The State of New Jersey in the exercise of its wisdom, and by the strong arm of sovereign governmental authority, is

making this public highway, for the accommodation of its citizens and the advancement of its revenues. The Legislature intended to do justice to individuals whose property should be taken for the construction of the road ; but it did not mean to put it in the power of Commissioners to defeat the object in view, by such extravagant assessments, as would nullify the charter, and bid defiance to any capital. And yet if we cannot upon a writ of *Certiorari*, relieve against an excessive and unreasonable assessment, such as this appears to be, the object and design of the legislature, may be entirely defeated. I admit that we cannot set it aside merely because the award is greatly beyond what we think would have been just and reasonable ; but when, as in this case, the defendant himself is unable to account for and sustain it, except upon principles and modes of calculation that result in giving more for a small portion of land, than the whole of it is worth, we should fail in discharging our duty, if we did not set aside and quash the proceedings.

The result of such a decision, will be to leave the parties in *statu quo ;* and if they cannot agree, Commissioners may be appointed by one of the Judges of this Court, upon the application of either party. The former Commissioners are *functi officio.* The old commission is at an end. It has been executed, and the Commissioners cannot make a new award under it, any more than the same surveyors can relay a road, after their return has been set aside ; or a justice can re-try a cause, upon the same process, after his judgment has been reversed. 10 *Wend. R.* 179. The argument, that if the former Commission has been executed, so has the statute, and that therefore no new appointment can be made, is unsound. The statute remains in force and will continue to operate until it has been effectually complied with ; but the proceedings that have taken place under the statute, have in this particular, been ineffectual and abortive ; they have been reversed and for *nothing* holden ; and it is therefore as if no appointment had been made. Suppose all of the Commissioners or a majority of them had died or refused to act, or had been misnamed, or selected from an improper county, or had been interested ? Would it in such case be pretended that no other Commissioners could be appointed, and that the charter would become void ? Or suppose the landholder had been dissatisfied

with the award, and had successfully impeached it upon the ground of bribery and corruption on the part of the Commissioners ; would he in such case insist that the matter should be referred back to the same Commissioners ?   I presume not.   Upon this point, I have not the least doubt.

In the course of this opinion, already too long, I have not examined the authorities, so numerously cited and so elaborately discussed on the argument, touching the office and effect of a writ of *Certiorari*, and the jurisdiction of this Court in proceedings removed here by such a writ.   It is sufficient to say that a *Certiorari* lies in all cases, unless taken away by the express words of a statute : *Rex* v. *Mosely*, 2 *Burr*. 1040 ; and not only, where there is another remedy, but even where an appeal is given upon the merits.   *Rex* v. *Mosely*, 2 *Burr*. 1040, *Kingsland* v. *Gould*, 1 *Halst. R.* 161.   *Middlesex election case, Coxe's R.* 244.   *Ludlow* v. *Ludlow*, 1 *South. R.* 389.

Let the award or report of the Commissioners in this case, be set aside and for nothing holden, &c.

FORD, J.   The New Jersey Rail Road and Transportation Company applied to the Chief Justice of the Supreme Court, under the sixth section of the charter, 2 *Rev. Laws*, 379, who appointed three persons to determine the compensation and damages, which Abraham Suydam had sustained, by reason of their road occupying about half an acre of his land.   In consequence of a difference of opinion, two only of those Commissioners united in a report, wherein they awarded to Abraham Suydam, five thousand eight hundred dollars, including therein, one hundred and two dollars, for making and maintaining a fence along the line of said road ; which award they filed of record as the statute directs, in the Clerks' office of the county of Middlesex.   The Company caused that award to be removed into this Court, by *Certiorari*, and alleged that it was made on illegal principles.— To prove this allegation, they have taken a number of depositions, upon notice under a rule of Court for that purpose ; and in like manner, counter affidavits have been taken on the part of the defendant.   He the defendant not only denies that the award was made on illegal principles, but he goes further and denies the authority of this Court, to inquire into the principles on

which it was made. He insists that the statute makes the Commissioners sole judges of the compensation and damages; and their award being legal on the face of it, the Court has no power to look behind it, into the principles on which it was made.

This raises a preliminary question. If the legality of the principles on which an inferior tribunal acted, cannot be lawfully inquired into by this Court, we need take no further trouble; all we have to do, is to confirm the award, be the principles ever so illegal on which it was made. But it is very evident to my mind, that such a prohibition would subvert the established jurisdiction of this Court; that it militates against all the public reasons on which the jurisdiction of this Court is founded, and against a series of adjudged cases, from our earliest reporter, to the present time. It is the glorious principle of our political equality, that the rights, privileges, liabilities, contracts, property, and even the lives, of all the citizens, stand upon one and the same law. The mode of insuring this law to every citizen, is to make it binding in the first place on the Supreme tribunal, and then appointing it to see that all inferior tribunals observe it likewise. Upon complaint by a citizen, that the law in his case has been violated by an inferior tribunal, if this Court cannot inquire into the point of complaint, to see whether it has been violated or not, the superintending power may as well be abolished. And then, a judgment, order, conviction or award of an inferior tribunal, need no longer be founded against any man on principles consistent with the law of the State; it will be just as good if founded on the law of the Church, the Jewish law, the Roman or French law, or no law, the color of the eyes, or length of one party's purse.

But the power to see whether justice is administered according to law, need not be deduced, at this day, from elementary principles : it may be safely rested upon adjudged cases. I will state a few and refer to others, where this Court has looked behind judgments and orders in inferior Courts, upon complaint of errors in law, and, being satisfied by affidavits or otherwise, of the truth of the complaint, have set them aside. The general doctrine was fully laid down in the case of *Ruhlman* v. *The Commonwealth*, 5 *Bin.* 26 ; Tilghman C. J. That writs of *Certiorari* and *supersedeas*, are means by which the superior jurisdiction

*inquires* into, and *controls* the exercise of inferior jurisdictions. In *Hance* v. *Deklyne, Pen. Rep.* 659, a judgment had been rendered on a verdict in legal form, by a justice, but it was complained that he had not exercised his jurisdiction according to law; that after the jury had retired to consider their verdict, he went into their room and conversed with them, a considerable time about the matter, instead of charging them in the presence and hearing of the parties openly in Court, and the matter being fully proved, (by affidavits) it was adjudged to be a violation of the principles of law, and the judgment was reversed. So in *The State* v. *Kirby*, 1 *Halst. Rep.* 143, a justice issued his warrant in the exact form prescribed by statute, to levy fines on certain persons for not performing militia duty. Illegality was alleged in a certain matter prior to issuing the warrant, that no legal return had been made to him, of the names of delinquents, before he granted it. The Court, upon hearing affidavits read, which established the fact, set aside the warrant. So in *The State* v. *Burnet*, 2 *Green's Rep.* 385. The Common Pleas in answer to a *Certiorari*, returned that they had appointed certain surveyors of the highway, by name, to lay out a road, but this did not prevent the Court from inquiring into their previous acts; and it appearing by affidavits, that they had appointed one among those surveyors, who had not filed with the Clerk of the township, any oath of office or affirmation, as required by law, the Court set aside the appointment. Thus the power of inquiring into the acts of inferior tribunals, for errors in law, has been exercised from the time of Penningtons' Reports to that of 2 Green, comprising a period of thirty years. Without such a power it is manifest that a judgment in legal form, though obtained by bribery, or upon any other illegal principle, would have to be confirmed in this Court. I shall refer to a few only, out of a multitude of other cases, where this power has been exercised. 2 *Halst.* 125; 5 *Halst.* 225; 7 *Halst.* 25, 87; 1 *Green*, 251; 2 *Green*, 504; 16 *Johns. Rep.* 49. If this assessment was made on legal principles, we cannot inquire any further into it; we have no power over the amount, for that depends on the *facts* and *merits* of the case, over which, the Commissioners were supreme; but they have no such supremacy over the law of the State. They must conform to it. If the law must conform to them, the

rights secured by it to men, would cease to be rights. The tribunals would erect themselves above the very laws they were appointed to execute, and the citizens would be prostrate before them. But such is not the public condition; and I fearlessly adopt the conclusion, that if the Commissioners have made the assessment on illegal principles, it may be inquired into, and if satisfactorily proved, this Court is bound to relieve against it.

The allegation is, that the assessment of the land, was not made according to its *present value*, but according to what it might become worth at some future time, in case the population should increase and the city be extended. Before this objection can be allowed, it must appear satisfactorily by affidavits or otherwise, first, that the Commissioners made the assessment on that principle; and secondly, that the principle is an illegal one.

First. Was the assessment made on the principle imputed to it? The affidavits present a medley of incoherent and contradictory evidence on both sides; but it is such as may be invariably expected, when mere opinions are asked for, instead of facts. Honest men seldom differ about the truth of *facts;* but when they cut loose from them, and launch out into the open sea of conjecture and opinion, they sail in such opposite courses, that hardly any two of them are to be found in the same latitude. These affidavits state every thing that may be called matter of fact, nearly alike, while in matters of opinion, hardly any two of them seem to agree. What is more extraordinary, hardly one of them is consistent with himself. Each one assigns a value to the whole lot; then he puts a value on each of the parts into which it is divided, and the aggregated value of the parts, differs most grossly from his previous estimate of the whole. It is a vain attempt to harmonize such irreconcilable opinions. I shall therefore rely only on those facts in which the witnesses all agree. Such is certainly the safest way, if the principles on which the assessment was made, can be clearly deduced from them. The facts which stand clear from dispute on either side, are these.

There was a lot of about six acres and a half of land belonging to Staats Vandusen, and this road was laid upon it, occupying about fifty-one hundredths of an acre, of it. No person had offered to purchase, rent, or improve it, for a great many years.

It lay in the outskirts of New Brunswick, part of an extensive *common* on the northerly side of the city, uninclosed and open to the world. While lying in this condition, a rage broke out in the year 1836, and suddenly overspread the country, for speculating in lands and lots. Under its influence, prices run up to the most giddy heights; and during that mania, Abraham Suydam purchased this lot of six and a half acres in the open common, having the Railroad staked out upon it, of Mr. Van Dusen, at the price of eight thousand dollars. The sale was however a *bona fide* transaction, and between two respectable and judicious men, who understood the current price of property in the city and suburbs, perhaps as well as any two men in New Brunswick. This fixes the value of it by matter of fact, which is the most infallible criterion, at that time, and it was only two years prior to the making of this assessment. Very soon after making this purchase, the rage for speculation came to a sudden pause. Prices fell throughout the country, to the dismay and ruin of thousands. It might naturally be expected that prices fell also in New Brunswick, before the time of making this assessment; that they did fall does not seem to be generally stated however, in the affidavits. But all the witnesses agree that there was no further rise, and that land in the city and suburbs, has never since been higher than it was in 1836, when the lot in question was sold for eight thousand dollars. Here we are in possession of a matter of fact, about which, there is not a shadow of dispute. According to this value of the whole lot, fifty-one hundredths of an acre would fall considerably short of seven hundred dollars; yet, instead of this, the Commissioners awarded for it, the monstrous sum of five thousand eight hundred dollars; and in this ratio, the whole lot must now be worth more than sixty thousand dollars, which on the face of it, seems indicative of some alarming error.

It is argued on the part of the defendant, that the sum of five thousand eight hundred dollars was not all allowed for the value of the land; that it includes one thousand dollars at least, for damages arising from the manner of making the road, which is constructed upon a horizontal level, through a lot of uneven undulating land, which occasions excavations from a foot to five feet deep, in several places; and before the city can allow streets

of houses to be built upon it, the lot must be reduced down to the level of the road, by a process of expensive grading. Now the nature of the ground is too uneven and irregular even to be built upon without considerable levelling, if the road had not been upon it. The making it as level as requisite for building, would be an addition to the intrinsic value of the lot. This the owner must have done all himself, or have sold it in that rough uneven state for so much less, if the Railroad had never been laid there. Now the Company having become owners of one-thirteenth part, ought they to pay more than one thirteenth part of the improvement, which can be of no use to their road, and must avail entirely to the benefit of the other part owner? Their thirteenth part of one thousand dollars would be only seventy-seven dollars, and yet the Commissioners have laid on them, the whole. If proportion among joint owners be good law, as it certainly is equity, this would seem to be an error in principle. It may be said in answer to this, that the Railroad is sunk lower than a building level would ever have required, and that a corresponding grade must now be the consequence, down to nearly the same level, whenever the streets come to be built up. This I should apprehend to be a great mistake. The cut averages not over four feet deep. Now if the surface of the ground be only smoothed by taking down prominences and filling up gullies, as (road or no road) is always to be done for building up streets, this moderate declivity of only four feet equalized through a lot of six acres and a half, would seem so very important to be preserved, that the city might not suffer it to be in the least diminished; it would hardly be sufficient descent for gutters and sewers so indispensably necessary for cleanliness and public health. Greater declivities abound in all cities, than this is, even in New Brunswick itself. The affidavits do not shew that any other grading will ever be required or tolerated, except such levelling as the uneven surface of the ground would naturally demand, and therefore this great charge of one thousand dollars would seem to be unfounded. But it seems liable to still another objection. This sum of one thousand dollars is awarded to the owner of the land *presently*. He may put it out to interest at six per cent, till the extension of the city to this vacant land, shall require it to be laid out in grading the lot. When that time will come,

seems to be very uncertain ; some of the witnesses think in fifty years ; others think it may be less. Suppose it be in only half of that time, one thousand dollars at six per cent will then amount to three thousand five hundred dollars, for only one thousand dollars worth of grading, which, too, may never be permitted. Now if the Commissioners estimated the improvement of the lot by grading, at one thousand dollars, and laid the whole of it on the owner of only a thirteenth part, and ordered him to pay the money presently without any rebate, though it may not be wanted in ten or twenty years, I am at a loss for any principles of law or equity on which it can be justified. But as the affidavits do not fling any plain light on this matter, I do not choose to place my opinion upon it. Therefore I shall let this great item for damages, with these remarks, stand at one thousand dollars. Then if this sum, and also one hundred dollars for fencing be deducted from the whole award, there will be left four thousand seven hundred dollars, for the value of this half acre of land. The question is, upon what principle, this value was put upon it.

The defendant's counsel refer to the affidavits of his witnesses, and by them would show the principle of valuation. All they *know* concerning its present value, is the price it was recently sold for, which would bring this half acre to about seven hundred dollars. Beyond this, they have no knowledge. But they make very free conjectures. They tell us what it "*may be*" worth, without telling us *when*. It is all a may be. New-Brunswick some time or other, may be a great and extensive city ; and in waking dreams, evidently of future times, their fancies actually run up this lot, to what I had almost called the merry sum of sixty thousand dollars, as remote from the sober fact of eight thousand dollars, at which it was recently sold, as a midnight dream. And a reference to these affidavits, makes it as evident as demonstration can make any thing, that the Commissioners did not estimate the *present value* of the land, but indulged in guessing, just as the witnesses do, at its prospective, future value, without any certain principles of judgment.

Secondly. We are to inquire whether in doing so, they acted on legal principles. It will not be denied that every tribunal is bound to conform to the laws of the State. None of them are

above it, whether supreme or inferior ; nor whether permanently organized, or created for a special and particular purpose. Beside being all bound by the common law ; as altered from time to time by the Legislature, most acts creating temporary tribunals for special purposes, use some particular words or phrases which the Legislature intended should guide them, in the exercise of the powers delegated, or limit and control them. The section conferring on these Commissioners, power and jurisdiction, is a signal example of it. It says they shall be appointed to determine the *compensation and damages* which the owner of said *real estate, has sustained."* To determine, is to perform a *judicial* act. In the next place, their power is limited to give a *compensation.* There it stops, it can carry them no further, by the express words of the clause. " *Compensation,"* means an *equivalent* for the value of the land. Any thing beyond that, is *more* than compensation ; any thing *short* of it, is less. So their power is expressly confined to an *equivalent.* But the statute goes further still ; it plainly and necessarily implies a *present* equivalent; for the company is to pay the money down. And this equivalent is just as plainly to be, for the *present* value of the land, not its future value. This is manifest from their having to determine the value judicially. A contrary construction, would render the execution of the power, utterly impracticable and impossible. No human tribunal is able to *determine judicially*, what the *future* value will be, in some future period of time. It depends on contingencies which are known to God alone. They can determine judicially, just as well, whether the next season will be a fruitful one ; the next after it, favorable to navigation and commerce ; and the next after that, a year of war or peace. Mortals may *guess* at things future. The witnesses have done so ; and their random, incoherent work is before us. But the Commissioners are not appointed to guess : that is soothsaying. They are judicially to determine what *is ;* and are confined to the *present value of the land.* At this point, their functions cease, and ought to cease. If the owner gets the full present value of the land, and likewise his real damages, he gets all the compensation or equivalent that the law intended to give him, and all that the act ever intended the Company should pay. There are no certain principles of judgment, by which future

things can be judicially determined. Our utmost talent is to guess at them. But who ever heard of a guessing tribunal being established by law? What citizen would not tremble for his life, liberty and property, if placed before it? Such a tribunal was never yet created by the Legislature; nor can it be constituted by construction.

It is not meant that the Commissioners may not take into consideration, any and every *fact* that can bear on the question of present value; such as any pressing demand for building lots on account of their scarcity; the highest price at which actual sales have been made; sums that have been offered with a bona fide intent to purchase, though refused by the holders; the proximity of the land to buildings already erected, or to public works, or to the common marts of business; and a multitude of other facts that consistently with law and common sense, might influence the judgment. Such are not visionary opinions; they are matters of fact. But when all the maps and the affidavits shew, on one side of the town only, a region of commons four times greater than the present city; that eight thousand dollars is the highest price ever known for this whole lot; that half an acre of it at this rate would not come to seven hundred dollars, yet that the Commissioners have allowed four thousand seven hundred dollars for it: we cannot but know, if we are capable of knowing any thing, that they did not mean it to be a judical opinion of its *present* value, but an opinion of what it might come to be worth, at some future time; yet they have not stated when that time will be; probably they had no fixed idea of it in their own minds, and therefore could make no rebate for it. We have nothing to do with the amount of the award; it is the principle to which I object. The statute empowers them to award only the present value of the land, and they have not exercised the power within that limitation. I do not say they have violated the statute, by design. I do not think so. It has arisen from mistaking their powers under it; but that is no less fatal to the award.

Thirdly. The face of the report exhibits a technical error which I at first supposed might be amended by the Commissioners themselves, by leave of the Court; but I have since satisfied myself that we have no power to authorize an amendement of the record before us. The award is a fixed record of the Clerk's

office of the county of Middlesex, there to remain, by express direction of the Legislature. What is sent here for our examination, is only the tenor or copy of it, and if we should amend the copy, the original would still remain in Middlesex, unaltered; and we must take it as it is. The error is this: the Commissioners have made an allowance of one hundred and two dollars for fencing on the line of the road, without finding the fact that it is laid through ' *improved land:* ' and the statute gives them power to make such allowance upon the sole condition of the road being laid through improved land. Nobody is authorized to decide that it was such land, but themselves; for they are made sole judges of the facts of the case. As the award now stands, they have allowed one hundred and two dollars for fencing without any authority. We cannot presume a lawful authority where none appears. It would be the most dangerous presumption imaginable, that because a person has done an act, therefore he had a right to do it. It would legitimate the most dangerous actions that any bad man could perpetrate. If the award had given five thousand, six hundred and ninety-eight dollars, for the value of the land, and damages, and then had made a distinct award of one hundred and two dollars for fencing, the latter could have been set aside without disturbing the former; but they are blended together in one sum, and we cannot set aside the sum for fencing, without altering the principal sum in the award. I am therefore of opinion on both the foregoing grounds, that the award is illegal and must be set aside.

WHITE, J. This *Certiorari* brings up the proceedings or assessment made by Commissioners appointed pursuant to an act of the Legislature of New Jersey, passed the 7th day of March, A. D. 1832, to determine the compensation and damages sustained by the defendant in *Certiorari*, by reason of the Company's taking and occupying a portion of the real estate or land of Mr. Suydam, for a rail road.

The State of New Jersey being one of the sister republics of the United States, prompted as well by her interest as her inclination to keep pace with other States, in the march of internal or public improvement, on the 7th day of March, A. D. 1832, by the supreme power of the State, chartered a Company for

the purpose of making a rail road from the city of New-Bruns-
wick, to some Ferry on the Hudson river, opposite the city of
New York, for the transportation of passengers and goods; and
after prescribing the mode of forming the Company, by the 6th
*section* of the charter, they invest the Company with all the
rights and powers necessary to the survey, laying out, construc-
ting and repairing said road, determine the width, fix the points
to, and from which, the said road should go, and point out the
general route of the road. And it is enacted that all lands and
real estate entered upon by the Company, which are not given to
the Company, shall be purchased by them, at a price to be agreed
upon by the owner and Company; and in case of no agreement
as to price, it is made the duty of the Chief Justice, or other
Justice of the Supreme Court, upon notice to the parties, to ap-
point three disinterested Commissioners from the county in
which the lands lie, to determine the compensation and dama-
ges which the owner of the real estate or land taken or required,
has sustained by reason of the occupation thereof by the Com-
pany.

And the said Commissioners are directed and required also to
assess the damages which any individual may sustain, by the
said road, arising from the removing, making and maintaining
the fence on the line of the route of said road, through any *im-
proved* lands over which the same may run. And the said Com-
missioners are required to take an oath or affirmation, faithfully
and impartially to discharge the trust reposed in them. And
they are to deliver to the Company, a written statement signed
by them or a majority of them, of the awards they shall make,
containing a description of the lands or real *estate appraised,* to-
gether with the amount of the assessment, for removing, making
and maintaining the fencing, which statement is to be recorded
in the Clerk's office of the county.

And it is enacted that if the owner of any real estate, land or
materials, should feel himself aggrieved by the decision of the
Commissioners, he may appeal to the next Court of Common
Pleas of the county, and there have the matter tried by a jury.
And it is enacted that if in case the Company shall abandon the
road, at any time after it is completed, or cease to keep the same
in repair, at any time for three successive years, then the char-

ter shall be annulled, and the title of the land shall revest in the person from whom the same was taken.

By the 8th *section*, it is enacted, that no farmer belonging to this State, shall be required to pay any toll for the transportation of the produce of his farm, to market, over the road in his own carriage, weighing not more than one ton, when the weight of such produce shall not exceed 1000 pounds, but the farmer may be charged toll as for an empty carriage.

By *section* 17, at the end of thirty years, the State is at liberty to take the road, at an assessment to be made.

By the 18th *section*, the Company are bound, after a certain period, to pay a tax to the State.

These several enactments are altogether inconsistent with the idea that this road is mere private property, or that it is a grant by the legislature, to a private Company to take the real estate or land of the citizen for private use alone; it is in my view, property taken for the public use; leased to a private Company, for a term of years, on terms mutually agreed upon by the public, through their representatives, and this Company.

Mr. Suydam and the Company disagreeing as to the compensation to be made to him, for the land through or over which the road passed, application was made to the Chief Justice, and three Commissioners were, on due notice, appointed to perform the duties designated by the charter. And the said Commissioners after being duly sworn or affirmed, proceeded to execute their duty, and made their report, which was duly filed in the office of the Clerk of the county of Middlesex. And on motion in behalf of the Company, a *Certiorari* was awarded by this Court, directed to Mr. Booraem, the Clerk of Middlesex, to bring up the proceedings to this Court; and the return of the writ with the proceedings of the Commissioners are now before the Court, and on which, we are called on to confirm the award, made, or to annul the same.

This is a question of more than ordinary interest; the determination of it may have a bearing on future legislation on matters of internal improvement; and it will be so considered by corporations or capitalists, who are inclined to invest money in those improvements. The right of the aggrieved party to redress, is denied; the power of this Court to inquire at all into this mat-

ter is questioned. And the right of the Court to look into the merits of the case, or to interfere with the amount of compensation or damages awarded by the Commissioners, is denied in strong terms by one of the counsel for the defendant. And whether the Legislature of the State have the power to take the soil and freehold of one of our citizens, and invest the right in a Company for the purpose of forming a Rail Road, is in some measure questioned.

The general superintending power of this Court, over inferior jurisdictions and all persons invested by the Legislature with power to decide on the property or rights of the citizens, should not now be called in question, it has been long exercised and admitted, and is confirmed by many adjudications.

But it is said that this Court cannot look at the amount of damages assessed by the Commissioners. And are we then in that strange position, in a Court of Common law, with full powers to correct the errors and mistakes of inferior tribunals, and all who may have power given them by statute, to pass on the property or rights of others; and under an obligation to see justice duly administered to all, that if in the making an assessment of damages, the Commissioners exceed their authority, make a plain mistake as to the principles on which they are to proceed in making that assessment, or if disregarding all justice and equity, they should assess a sum so exorbitant as to convince every mind that injustice has been done, and that too from impure motives, that this Court, when the matter is fully before them, and they see that gross injustice has been done, are we to confirm an assessment of this character, because no legal technical error is apparent? Can we not look at the amount of assessment, to find out the principle on which it is made, or to see if it has been made on any legal principle; not, to be sure, to alter, but certainly we may look to see on what principle it has been done, and we may, if the assessment is made without regard to any principle, or if the principle is neither legal nor just, set aside the award?

To the Legislature belongs the power of determining when it is proper to exercise the right which is vested in the State, and what is a public use, for which private property may be taken. A highway is particularly under the control, (and is at all times to

New-Jersey Rail Road and Tr. Co. v. Suydam.

be made by the grant, or under the authority) of the legislature; it is indeed a part of, or essential to sovereign power; and in every country, the roads are as essential to the government, as the navigation of the rivers; and I know of no power in this State, except the legislature, which can direct when and where, and on what terms, a highway leading over or through the State, can or shall be made; and I see no distinction in the exercise of that power, whether the road is a common Highway, a Turnpike, or a Railroad; they are all for the public use, and how they shall be made, the legislature has the right and the power to decide, and may either do the work by their agents, or authorize a Company, on equitable terms, to do the same; and when they have so ordered, the private interest of the citizen, must yield.

This right of the State to take and appropriate the lands in the occupation of the citizen, was exercised in this State, soon after the settlement of the country. In Smith's History of New Jersey, it is said, public roads shall be set forth at any time or times hereafter, at the discretion of Commissioners, in or through any lands taken up, on reasonable satisfaction, at the discretion of the Commissioners.

In 1676, *Leaming & Spicer*, 118, it was enacted, that two men should be chosen by the town of Middletown, and two by Piscataqua, to make out the nearest and most convenient way that could be formed between the said towns.

In 1765, it being represented to the Legislature, that the road from Burlington to Amboy ferry, and some other places, might be considerably shortened, Commissioners were appointed, and the act recites, that " whereas the shortening and improvement of the roads will greatly facilitate the conveyance of letters by the post; be of great importance to his majesty's service, and to the commercial interest and general convenience of the inhabitants of this province: the Commissioners were directed to make a straight and perfect survey thereof from the city of Burlington, through Bordentown, and Cranberry, to Amboy."

We are told, that by the act incorporating this Company, an appeal is given only to the land holder, and not to the Company; and under the maxim *expressio unius est exclusio alterius*, the right of *Certiorari*, or the right to except to the assessment, is taken away. I cannot see that this conclusion is correct. The

right of appeal to the Common Pleas, is forbid or rather not granted to the Company, therefore cannot be taken ; but it would, I think, be extending the matter too far, to say that all other remedies or redress, if any existed, are taken away. It is then left where it was, and the question is still asked, have the Company the right to call on this Court for redress, provided they are aggrieved by the award of the Commissioners ? If it is true that every injury received is to have a remedy some where, and no other tribunal is named or known where that redress is to be sought, this Court by its general superintending powers over other tribunals, must be the place where the party injured is to seek redress. If no appeal had been given to either party, would there be no remedy ? I think either party would be entitled to *Certiorari ;* but when one party has by the act, a remedy by appeal, on a particular point, there is a propriety in confining that party to the appeal, and in not extending the right of *Certiorari* to inquire into a matter which may be redressed on the appeal.

The Legislature were aware of the question so frequently raised, and the clamor made against taking private property for public use, without submitting the matter of compensation to the trial by Jury, if requested : and it was perhaps prudent for them, and safe for the Company, to give the landholder, the appeal in case he was not satisfied with the determination of the Commissioners. But as the Company had no rights or privileges, but those granted by their charter, and it was a matter of choice with them to accept the charter or not, without this provision, they cannot complain that they have not the trial by jury granted them, to correct the mistakes or avoid the effects of a misjudgment of the Commissioners. The Company's right to a trial by jury, depends on the land holder ; if he does not appeal, there can be no jury, and surely this would rather strengthen or increase the disposition of a legal tribunal to extend any other remedy for their relief against an improvident assessment. And I cannot think it possible, that in a country where the government have the superintendence of the public interest, and where it is admitted that the supreme power has a right to use and appropriate to the public use, private property, that any tribunal created by that power, to decide on the rights or property of the

citizen, can by their acts, veto the Legislative enactments. If commissioners when appointed, do make an exorbitant assessment, without regard to principle, or on an erroneous principle, and there is no tribunal in the state, to correct their proceedings, or set them aside, then do they hold the veto power, and can prevent any public improvement. There should be no such power, in commissioners. There can be none such in a well organized government. That the erected power should annul the act of the supreme power, is an absurdity. I cannot subscribe to such a doctrine—when it is done, or attempted, where is the question to be settled? The legislature cannot explain, or give a construction to their acts, so as to grant relief,—that power is in the judiciary. It is then in this court that the question must be examined and decided; and we are bound to see that the supreme power of the state, is not set at nought.

If I am right in this principle, that no created power can veto the acts of its creator, then I apprehend that the learned counsellor laid down the position too strongly, when he said, the court had no power to look at an assessment, because the amount of damages is too great. He denies the power, and asks, where it was created. I apprehend it was given when the tribunal was created, and has always existed with it.

It is the very essence of supremacy, to remove all obstacles to its action within its own sphere.

That the court has the right to examine the award made by the commissioners, to look into it, and if they find injustice has been done,—that erroneous principles adopted by the commissioners, have been the foundation of that award, against which the party complains; or where there can be no principle in reason or justice found, on which the award can be sustained, they have the power to set the award aside.

Admitting the legal positions to be all as laid down, yet there is still an important inquiry to be made in this case. Have the commissioners transcended their powers? Have they abused the trust and confidence placed in them?—Have they made an award not founded in reason and justice,—or have they made an award founded on erroneous principles?—And to determine these questions, it becomes necessary to look at the act of incorporation, and the object and intent of the legislature. That body had de-

termined that a great state improvement should be made ;—that a Rail-road was required for the benefit of the travelling and commercial community, and had decided that they would not do that work themselves, and tax the inhabitants, but would authorize a company to make the road ; and required that the company should pay the landholder such compensation and damages, as commissioners should award for the lands and real estate so to be occupied by the company ; and damages arising from the removing, making and maintaining the fencing on the line of the road, through any improved lands, over which the said road should run.

What did the legislature mean by compensation and damages ? I presume they intended compensation for the lands occupied by the road, at a fair price, and damages for the destruction of a garden or other improvement, or for pulling down a dwelling house, a barn or other building, on the land to be occupied by the road, or occasioned thereby unnecessarily—something real, not ideal, or speculative ; and also the expense of removing, pulling up and repairing fencing, on improved lands. It never could have been the intent of the legislature, to give a farmer, damages for having a rail road located between him and his mill or market, or for having the road raised above, or sunk below the level of his adjacent lands—or for having a *Loco-Motive* engine to pass near, or through his farm. For, by the 12th *Sec.* of the act, the company are bound to restore any road or highway, which shall be crossed by their road, to such state or condition, as not to impair its usefulness.

By the Charter, the commissioners are directed to deliver to the corporation, a written statement of the awards they make, containing a description of the Lands or real Estate *appraised by them*, together with the amount of assessment for *removing*, making and maintaining the fencing. Can they describe any land or real estate, not taken or occupied by the road ; or can they appraise, or value any other lands or real estate, than those they describe ? I apprehend not.

Of the lands described and *appraised*, the Corporation, on paying the assessment, becomes seized in fee.

The facts which the Court have before them, into, and through which, they must look for the principle on which the Commis-

sioners acted in making their award, are first, That 51-100 of an acre of land belonging to the defendant, is occupied by the road; that this land lies in the vicinity of the improving city of New-Brunswick, and is laid out in town lots which may possibly at some future day, be built upon—that it is a part of six and a half acres of land bought by Mr. Suydam, in 1836, for the sum of 8000 dollars. That the assessment of damages, for the land occupied by the road, after deducting one hundred and two dollars allowed for the expense of removing, making and maintaining the fence on the line of said road, are 5,698 dollars. It is, I think evident too, that the purchase was made by Mr. Suydam, after it was ascertained that the Rail Road was located on this tract, it then being in possession of, and owned by Mr. Vanduysen, and it is not stated, that any improvements of any kind, were erected on the land taken by the Company.— Surely then, the assessment for 51-100 of an acre of land, without erections or improvements of any kind, must strike the mind as exorbitant, unless something more can be found to inhance the value. The defendant in *Certiorari*, appears to have been sensible of this, and we have, produced before us, the depositions of many witnesses, to show that the damages for the land taken by the Company, are to be estimated at a much larger sum than what would appear proper from the facts above stated, to be a fair compensation for 51-100 of an acre.

If we inquire further for the principle on which the assessment or valuation of the land, has been made, as no principle is assigned by the Commissioners, we must look for it, in the evidence produced before the Court. Looking into the depositions read, we find no uniformity of opinion, as to the value of the land occupied by the road. Some of the witnesses estimate the damages at a sum far below that of the Commissioners; and others, in accordance with the Commissioners. One of the latter description, says it will require much expense to graduate the lots of Mr. Suydam, west of the road; and that those lots if a *Loco Motive* power is to be used, are much reduced in value; and this witness estimates the injury done to those lots, at 1000 dollars.

Another witness speaks of the depth of the excavation of the road; says it must be six feet—and that other lots not taken by the road, but contiguous thereto, are reduced in value; and that

great expense will be necessary to graduate the lots to the said road track—and in view of these injuries, the witness estimates the damage of defendant, at 5,800 dollars, and thinks it within reasonable bounds.

A third witness testifies to the fact, that six feet excavation will be required in the road, and that it will require a considerable expense to graduate the adjoining lots; and he estimates the damage at $5,510, and says, in that estimate, he takes the damages done to the adjacent lots not occupied by the rail road.

And another witness says, that it will be necessary to graduate the adjoining lots to make them suitable for building lots; and considers the lots west of the road, materially deteriorated in value, in consequence of the necessity of crossing the rail road, to get to New-Brunswick; and also, from the fact that a Loco Motive is to be used on the road; and he estimates the damages done, at 5000 dollars. Other witnesses examined in behalf of the defendant, make the like declarations of the injuries done, as well to the adjacent lots, as the lots west of the road, and make a like estimate of damages on similar principles: and those are the facts presented to the Court, by the defendant, outside of the award of the Commissioners, and in addition to what is apparent to the Court, from admissions and other evidence. And in all this, I am not able to find any principle, void of error, on which the estimate of damages can be made at the sum of 5,698 dollars for 51-100 of an acre of land, being a part of six and a half acres, which in 1836 was only worth 8000 dollars at a fair price between buyer and seller.

It is my opinion that this award of the Commissioners, as it cannot be amended or altered, must be set aside.

DAYTON, J. On the 18th of April last, upon application made by the above Company, to the Chief Justice, pursuant to the act &c. Nicholas Wikoff, James Fisher, and Daniel B. Applegate, were appointed (with the consent of both parties) Commissioners to determine the compensation and damages sustained by Suydam the owner of certain real estate, by reason of the occupancy thereof by the Company, for the purposes of said Rail Road, pursuant to the 6th *section* of their charter.  *Har. C.* 379.

The Commissioners having acted in the premises, the dama-

ges were assessed by Wikoff and Fisher, two of them, at five thousand, eight hundred dollars, (including therein $102, for fencing) and an award in writing was signed by them, on the 25th of April last,—(Applegate, the other Commissioner, being present, but declining to sign the same). The written statement of which, having been filed in the Clerk's office of Middlesex, this *Certiorari* has been issued to him, and brings up the papers into this Court, for consideration.

The award of the Commissioners, upon its face, and in all mere matters of form, is not objected to, by the Company ; but they have assigned numerous reasons, *aliunde* the record, for setting it aside : such however as have any evidence whatever to support them, may be fully considered, as I apprehend, under the following heads.

I.—That the Commissioners were *not disinterested,* as required by the statute.

II.—That in making the assessments, they were operated upon by *gross partiality* or *prejudice*—and that the amount of the award is *grossly exorbitant* and *unjust.*

III.—That the Commissioners adopted an *erroneous principle,* in making the assessment.

In support of the first of these reasons, it is alleged that Fisher, one of the Commissioners, was a creditor of Suydam, to the amount of $8000, and as such, might have had an indirect interest in procuring for him a large award : that this fact was unknown to the Company at the time of his appointment.

The only evidence however, of such indebtedness, is the Copy of an Abstract of a Mortgage, from Suydam to Fisher, on *other lands,* to secure the amount above stated, as registered in the Clerk's office of Middlesex ; which copy under the certificate of the Clerk alone, was offered and marked as an exhibit by the Commissioner. This clearly was no evidence, and having been received by the Commissioner *de bene esse,* is liable here to all legal exceptions. The statute, passed 7 June, 1799, requires that a deed, together with the acknowledgments or proofs, shall be first recorded word for word, with all interlineations, and words visibly written on erasures, &c. and the record thereof, is made evidence as available in law, as if the original were produced and proved. But then it must appear by the record, that

the acknowledgments or proofs are according to the statute ; if otherwise, the entries by the Clerk, are unauthorized, and no evidence. ·

· The act requiring the registry of Mortgages, which was passed the *same day*, was intended for a wholly different purpose, and contains no such provisions as are found in that just cited. The registry is not a Copy,. but a mere abstract of the contents of the mortgage. No copy of the acknowledgments or proofs, are made. Nay, the Statute does not even require any entry or note thereof, in the register: the sufficiency of these acknowledgments or proofs, in the case of mortgages, is left entirely to the judgment of the Clerk, (the inaccuracy of which, is shown by the records of numerous deeds with imperfect acknowledgments). To make these Registry-books evidence, would be to give them a higher force, than our records of deeds. It was never so intended : the register is not competent evidence to prove an indebtedness, or for any other purpose, except merely to show the collateral fact, that such a mortgage has been registered, as a ground for the legal inference of notice thereof to subsequent encumbrancers. It is made evidence for that purpose *alone*, by the statute. At common law, it is certainly in itself, no evidence at all ; and if it become necessary to prove the contents of a mortgage, (except as connected with the question of notice) it must be done on common law principles ; first by proof of the loss or destruction of the original, and then by evidence of its contents. *Den* v. *Gustin*, 7 *Hal.* 43.

· But in this case, the Register itself, even supposing it competent, was not produced, but a copy certified by the Clerk under the seal of the Court, was offered in its stead.

This too, was insufficient. The Clerk is authorized *by statute*, to certify copies of deeds recorded at length, and such copies so certified, are made legal evidence : but there is no such provision *by statute*, in reference to the abstract of mortgages. Neither has the Clerk such right, at *common law*. Copies are of three kinds—*Exemplifications*—Copies by an officer *authorized to make them*—and *sworn* copies—1 *Stark. Ev.* 151. The Clerk as before said, is not authorized by statute, to make these copies. Nor is this a sworn copy—but being under the seal of the Court, it is in the nature of an exemplification. But the Clerk has no

common law right to do this. An exemplification can only be of the records of the Court under whose seal they are exemplified—*B. N. P.* 228—*Esp. N. P.* 473. These Registers are no part of the records of the Court of Common Pleas, of which this officer is Clerk. Such Court has nothing to do with the registry of these mortgages. It is an additional and distinct duty superadded by statute, to the Common Law duties of the clerk of that court. If a party requires a copy of these abstracts, as evidence, he must procure a *sworn* copy. The registers are books or documents of a public nature, and which, the interests of the public will not admit of being moved from place to place. In all such cases, it is a general principle, that where the original would *of itself* be evidence, a sworn copy is equally available. 1 *Stark. Ev.* 157, and cases cited, *vid.* also *March* v. *Colnett,* 2 *Esp. Cas.* 665; *Peak's N. P. C.* 30; *B. N. P.* 247; *Esp. N. P.* 473. In no point of view therefore, in which this evidence can be considered, is it competent to establish the fact of indebtedness on the part of Suydam to Fisher. The objection therefore, if well taken, (which is by no means admitted) fails for want of proof—

2 ——— To support the charge against the Commissioners, of *partiality* and *prejudice,* (the first objection being wholly unsustained) the Company must rely upon the alleged *exorbitancy* and *injustice* of the award. These objections are therefore necessarily considered together. Here it is necessary that we advert to the evidence. It is not pretended that any witness speaks to any distinct, overt act of the Commissioners, indicating partiality or prejudice; it is only inferred, from the amount of the assessment: that constitutes the entire *substratum* on which this objection rests. Strip it of its real or fancied exorbitancy, and there remains nothing to give it even the color of truth. There is indeed, no complaint against the award, except in reference to its amount. All the other objections lean upon this. It is the amount alone, which is complained of, as *oppressive* and *unjust.* It is the amount alone, which indicates *partiality* and *prejudice.* So too, it is the amount which proves, as contended, the adoption by the Commissioners of an *erroneous* and *illegal principle.* I again say that, it is the amount, and nothing but the amount of the award, which gives point to every argument against its validity. Bearing this fact in mind, let us proceed to an examina-

tion of the powers of this Court, upon a common law *Certiorari*.

That we have in this way, jurisdiction over this award, by virtue of our general supervisory powers over inferior tribunals, is too clear to demand either argument or authority. But our powers are not boundless. We are confined, I apprehend, to an *inspection* of the papers, and an examination of such evidence only, *dehors*, as may tend to show *illegalities* therein—including under this term, all *misconduct* in the Commissioners.

We are told in the books, and from the earliest history of this writ, that "it is to be granted on matter of law only"—1 *Lill.* 252. And this principle has been recognized through all the English cases. Many of the ancient authorities limit the powers of the Court, not to illegalities alone, but to such as appear upon the face of the record. They confine us to an *inspection*, for the mere purpose of seeing that inferior tribunals keep *within their jurisdiction*. As in *Groenwell* v. *Burwell*, 1 *Salk.* 144 ;—*Rex.* v. *Whitebread, Dougl.* 553 ; *Rex* v. *Morely ; Rex* v. *Osborne ; Rex* v. *Reeve,* and *Rex* v. *Norris,* 2 *Burr,* 1042 ; the *King* v. *Lloyd,* 2 *Str.* 999. And other cases may be found in the books to the same effect.

But wherever we meet with such decisions or *dicta*, it will be found, I apprehend, that they are cases of *convictions*, where it is required by statute, that all the evidence be returned on the record, 2 *Str.* 999—or where the Court in some way was possessed of every thing, on the face of the papers, necessary to judge of the legality of the proceedings. At all events, it is perfectly well settled at the present day, that the powers of this Court are not restricted in its search for illegalities, to a mere inspection of the papers. It is our constant practice on *Certiorari* to a Justice of the peace, to look behind his return, and show by affidavits *dehors* the record, not only that he has exceeded his jurisdiction, but that other illegalities have occurred on the trial. So, of the proceedings and return of Surveyors of the high-ways— *Coxe,* 128 ;—4 *Hal.* 17, 21 ;—2 *Hal.* 215 ; 1 *South.* 297 ;—3 *Green,* 88. So, of Commissioners to divide lands, 3 *Hal.* 84 ;—2 *South.* 554—and indeed of most other persons acting under a special power delegated by statute for public purposes—*Coxe, R.* 400. But although we are not restricted to a mere inspection of the papers, our powers are limited. There is no review at common

law upon the fact, either by *Certiorari*, or in any other way : an appeal, which alone secures that right, is always by statute. *Lowell* v. *Spring*, 6 *Mass.* 398 ;—*Street* v. *Francis*, 3 *Hammond*, 277. The writ of *Certiorari* is to a statutory tribunal, what a writ of error is to a common law court. 3 *Caines*, 86 ;—5 *Cowen*, 37. It brings up its proceedings for review, upon the law, and not upon the fact. In addition to the authorities already cited from the English books, many others may be collected laying down the same general principle, that this Court cannot on *Certiorari*, review the merits—20 *Eng. C. L. R.* 405 ;—13 *East*, 411 ; 11 *Pick. Mass. R.* 168 ; 4 *Halst.* 196, 209 ; 1 *Green* 98— 10 *Wend.* 168. And in the case of *Starr* v. *Trustees of Rochester*, 6 *Wend.* 564, it is said, that the Supreme Court has the power at common law, to review the proceedings of all inferior tribunals—to pass upon their *jurisdiction*, and review all their *legal decisions*, but not their determinations upon *questions of fact*, which are conclusive, unless a power of review is given by statute. And such, I have no doubt, is the law. Indeed, it cannot be otherwise, as the *Certiorari* brings up, not the evidence, but only the record. But it has been asked, is there no remedy for this Company ? Had the award been $20,000, instead $5,800, would they have been compelled to pay it ? Certainly not. If the amount of the award were so exorbitant it would *per se* be evidence of misconduct—of gross partiality, corruption or fraud. 2 *Vern.* 101 ; 17 *J. R.* 405. And this I take to be the only aspect of the case, in which this Court has the legal right to consider at all, the *amount* of the award.

Is it so great as to satisfy us, that these Commissioners were grossly partial or willfully corrupt ? Here let it be remembered, that the *onus* is upon the Company, and that the fact of unfairness or corruption as a ground for vacating an award, should be satisfactorily established. *Coxe, R.* 388.

It is not my intention to recapitulate at length the prominent facts to be collected from the voluminous testimony taken by the Commissioner ; it could answer no good end. But I have reflected upon those facts, as presented by the evidence, and with every disposition to give the Company the relief sought, if the case would warrant it. The land was bought by Suydam after the location of the Rail-road was known, and it may be with a

view in part to speculate upon the Company. He paid for 6 or 7 acres, which prior to that time, had laid open and unoccupied, the sum of $8000. These commissioners have within a few months after this purchase, assessed damages against this Company for crossing the same, and occupying the 51-100 of an acre, at $5,800, which at the same rate, (deducting $102 allowed for fencing, and $1000 as supposed for incidental damages) would make six and an half acres worth $59,621.

This brief statement presents in bold relief, the alleged exorbitancy of the assessment. On the other hand, ten witnesses testify that the lands in question being adjunct to the inhabited parts of the city of New-Brunswick, are valuable for building lots; and upon that assumption, they severally assess the damages—the medium of the aggregate amount of which (even excluding from the estimate of three of the witnesses, the cost of fencing) falls little short of the actual assessment. Nine other witnesses, again, upon the part of the Company (exclusive of the testimony of Sykes, the engineer) estimate these lands at a comparatively small amount, being valuable in their opinions only for agricultural purposes; but upon a cross examination, some of these witnesses estimate a portion of this land by the foot, and thus would arrive at a conclusion widely variant from their original estimates. The truth is, that among these discrepant calculations, and conflicting conclusions, it is difficult to determine, who is right, and who is wrong. The evidence to my mind, is unsatisfactory. The witnesses of the plaintiff in *Certiorari*, not only dissent widely from the witnesses of the defendant, but disagree among themselves. Nor is there much more of uniformity among the witnesses upon the part of Suydam. This very diversity of opinion, as to the rightful amount of damages, among judicious and upright men, (who are proved to be judges of the value of real estate) who are on the spot, and speak from facts and actual inspection, warn us to be careful how we deal with this award, on the ground of excessive damages. This is purely a question of fact, upon which the members of this court, are not more competent to judge, than the witnesses who have differed so widely from each other: and receiving our knowledge of the fact as we do at second hand, are perhaps even more liable to err. There is nothing which would justify us in saying that

the ten witnesses who have testified upon the part of Suydam, have been operated upon by gross partiality and prejudice; and yet, unless we are prepared to say that, how can we make this charge against the Commissioners? We know not with certainty even the facts by which they were guided in making their assessment. The result of their views is before us, but the manner in which they arrived at that result, can only be the subject of inference, here. It is admitted too, that they are upright men—well acquainted with the value of real estate, and judged upon *inspection*, not upon evidence. The testimony before us, contains many facts and circumstances, of which they perhaps never thought or heard; but this evidence has no legal competency, except to show that the commissioners were guilty of some misconduct, or in other respects proceeded *illegally* in the discharge of their trust. We may believe that the damages are too large—that the commissioners have committed an error in judgment, but this amounts to nothing. We do not sit here to give opinions upon such subjects, or weigh out damages with a golden scale. We only ask, are they so great as to verify the charge of misbehavior against the commissioners, of partiality, corruption, or fraud. I think most clearly they do not.

Before leaving this branch of the subject, I must be permitted to say, that I do not conceive the commissioners either have placed, or intended to place, a mere prospective value upon the land in question. . The language of their award, repudiates the idea. It says, they assess the damages which Suydam *has* sustained, &c. The witnesses uniformly base their estimates upon present, and not future value. It is true that for the purpose of arriving at a present value, they take into consideration, the gradual increase of the city; but surely, this is legitimate data. Were it otherwise if the road ran through a building lot in the heart of the town, it could be estimated only as land for agricultural purposes. These lots are, with perhaps, three or four exceptions, the only unoccupied lots in that part of the city. They are most favorably situated upon public streets, long since laid out, and in a part of the city improving more rapidly than any other. These streets did not (like others *beyond* them) come into existence for the first time, in the days of recent and wild speculation, by the creative power of lithography. They have been

in a steady course of improvement, for many years. It is true that much diversity of opinion exists as to the time which will probably elapse before they will be needed as a *whole*, for building: but this was matter of fact, exclusively for the judgment of the commissioners. That they have not been estimated at prices they may attain at a future and distant day, when they shall be all needed and built up, is clear: for had they been so, instead of $5 per foot, as present value, they would have been estimated at fifty.

3—But it is said that the commissioners in assessing these damages, have adopted an *erroneous principle*—done *palpable injustice,* and that this court will interfere in all such cases. The case of *Baldwin* v. *Calkins,* 10 *Wend.* 168, is cited as an authority in point; but it does not sustain the position as here applied. In that case, damages had been assessed for the overflow of the lands, at the full value of the land, when on *legal* principles, it should have been only for its overflow for a certain length of time. On *Certiorari* to set the assessment aside, *Savage, Ch. J.* says, the assessment would have been conclusive as to the amount of damages, if it had been made on correct principles, but "if they were erroneous, the whole assessment must be set aside." A proper interpretation of language, as I shall hereafter show, as well as the whole case, prove clearly, that the erroneous principles here spoken of, were errors in law, and not in fact.

The erroneous principle complained of in the present case, is this;—It is alleged that the commissioners have assessed the damages to these lands, as *building lots,* and not as lands fit merely for agriculture; that this was adopting a wrong basis of calculation, or in other words, an erroneous *principle.* Now this is the point mainly relied on by the Company; and yet it appears to me, to be based upon an entire misapplication of language. We speak of a principle of law, or a principle of ethics, as meaning a *tenet* of the science; but we never speak of a *principle* of fact.

In my judgment, there is no *principle* involved in the question whether the Commissioners did right or wrong in valuing these lands as building lots. If they erred, it was simply an error as to the fact, whether they were or were not valuable for that purpose. But the allegation that the Commissioners have adopted an erroneous principle, is not only a misapplication of language,

New-Jersey Rail Road and Tr. Co. v. Suydam.

but the argument by which the counsel endeavor to show what is the true principle, and which it is said, we must settle as a rule for the conduct of future Commissioners, is equally ill founded in philology and law. It is said that the Constitution of the United States, which says that private property shall not be taken for public use without *just compensation*, gives the true principle. But the word *principle*, here, means the abstract right to a just compensation, and not the thing itself. The Constitution recognizes the principle upon which *the land is to be taken*, but prescribes no rule by which an assessment is to be made. But again ; if this Court set aside the award, and direct the Commissioners hereafter to be appointed, to allow only a *just* compensation, it will be rather a useless exertion of authority. For in the first place, the statute under which the Commissioners are appointed, substantially requires this, and before acting, they are *sworn* to award it. And in the second place, the declaration of such a rule, by this Court, would not advance us a step in our progress ; because the question, what constitutes a just compensation, and the mode by which it is to be ascertained, would be as uncertain, as ever. If the land be valuable for building lots, it is possible that the assessment already made is but a just compensation. Before we can say otherwise, we must assume the right of deciding this pure question of fact ; to do which, would be a most unwarrantable assumption of power in this Court. Admitting however, for the argument, that this question was decided, it could not prove that an erroneous *principle* was adopted by the Commissioners, because no *principle* was involved in the question.

From the above remarks, it is evident that this case, *as proved*, is not one meet for the action of this Court, on *Certiorari*.

There is yet another view of the matter, which, though not particularly alluded to on the argument, is, in my judgment worthy of consideration.

The subject under consideration, is an *award*, and so designated by the statute, under which it is made. Not a common law award, it is true ; but of a special tribunal, created by statute, to arbitrate between the landholder and the Company. In accepting their charter, the Company have agreed to abide by its terms. They have adopted the Justices of the Supreme Court,

as their agent to select arbitrators or Commissioners for them. And an appointment by one of those agents may well be considered an appointment of the Company. The General Assembly who represented the other party, have taken care, when disseizing the freeholder without his direct assent, that he shall not be concluded upon the question of compensation, by the judgment of those selected in his behalf, by the representative body ; but have provided in the grant itself, that the landholder may *appeal* from the judgment of the Commissioners. No such right of review upon the facts, has been given to the Company. To them it is in the nature of a common law award. But being by public Commissioners in the execution of a public trust, is examinable here on *Certiorari*. Had we the right therefore, in this way, to look into and re-examine the merits in any case ; I should hesitate to do so in this, except upon the clearest grounds. On an award at common law, we cannot look into its *amount*, (scarcely indeed, save in particular cases, into its illegalities) except to see whether the damages are so *excessive*, as to show corruption or gross partiality. *Van Courtland* v. *Underhill*, 17 *J. R.* 405 and cases there cited.

Without intending to apply to this case, *en masse*, those legal principles which regulate arbitrations and awards, I cannot help thinking that the same reasons which induce Courts to lean favorably towards them, deserve consideration here. This is, upon the part of the Company, at all events, a tribunal of its own choosing. They sought and obtained this charter with its provision as to the appointment of Commissioners, staring them in the face ; it is a summary mode of settling these difficulties, at little expense, and without reference to technical rules of law. It has its advantages, it is true, and in view of those advantages, the Company appear to have lost sight of the maxim, " *Qui sentit commodum, sentire debet et onus.*"

From the want of power in this Court, to act upon the case as presented, *by the evidence,* and from the nature of the *thing* to be acted upon, I am clearly of opinion, that the *Certiorari* be dismissed.

NOTE. Some weeks after the above case was argued, and the above opinion prepared, my attention was directed by one of

my brethren, to certain technical objections apparent upon the face of the award. No copies of this award, were furnished to this Court. No such objections were ever hinted at by the counsel on the argument; nor have any reasons been filed, either general or special, under which the same can be fairly embraced, as (heretofore) required by the rules and decisions of this Court. *Regulæ Generales, p.* 19 *sec.* 3; *Griffith* v. *West,* 5 *Hal.* 350. In this case, Chief Justice Ewing lays down the rule of practice; thus. "That to enable a party to avail himself of an objection, he must file either a general or a special reason." That "under a general reason, the practice has been to allow the plaintiff to insist on any error apparent on *the face of the proceedings,* saving the opposite party at all times, from prejudice by surprise." The inference from this language clearly is, that without such general reason, the plaintiff cannot (under the practice of this Court) insist upon even such an error. But, be this as it may, and I express no opinion upon it, to justify us in setting aside these proceedings, of our own volition, under the circumstances of this case, the errors should certainly be most clear in themselves, not amendable and vitally important. I cannot help doubting whether those referred to, be of this character. I have considered them at best, but as "*apices litigandi,*" upon which I was unwilling in so important a matter, to rest an opinion against the defendant, *unheard.* It has been well said that "next to doing right, the great object in the administration of public justice, should be to give public satisfaction."

NEVIUS, J. gave no opinion, having been of counsel with defendant.

*Award and Report of Commissioners set aside.*

Indispensable engagements of Governor Vroom, prevented his furnishing his brief to the Reporter, in time for insertion in the usual place. It is therefore placed here.

*P. D. Vroom,* for defendant.

This case is brought before the Court, by the common law writ of *Certiorari.* The legitimate office of this writ, is to re-

move proceedings from inferior tribunals into this Court, that it may be seen whether they have acted lawfully, and within the limits of their jurisdiction.

Various reasons have been relied on for setting aside this assessment.

I.   It is alleged that James Fisher, one of the Commissioners, was not disinterested, because he held a bond and mortgage against Abraham Suydam, to a large amount.

The answer to this is two-fold.

1.   There is no evidence of the fact.

The certified copy of the registry of a mortgage, is not made evidence, by statute.   And nothing else has been produced.

2.   If the fact be proved or admitted, it establishes no interest.

There is no adjudged case to be found, in which such a relationship has been held to constitute an objection against the impartiality of a Judge, a Jury, or any person called to pass upon the rights of others ; and that should be conclusive.   To establish such a principle at this day, would be inconvenient and mischievous in its consequences.

II.   It is insisted that the assessment is grossly exorbitant, and therefore should be set aside.   And this is, in truth, the principal question in the case.   Can this Court sit in judgment on the merits of this assessment ?

I take the principle to be perfectly settled, that the writ of *Certiorari* is given to review the legal proceedings of inferior jurisdictions, and not to re-try or investigate matters of fact. The merits of a question or matter in dispute, can never be retried on a writ of *Certiorari*.

In *Rex* v. *Moreley*, 2 *Burr*. 1042, the Court said, a *Certiorari* does not go to try the merits of a question, but to see whether the limited jurisdiction has exceeded its bounds.

So in *Rex* v. *Glamorganshire*, 1 *Lord Raymond*, 580.   A *Certiorari* will be sent to inferior tribunals, that this Court may keep them within their jurisdictions, and if they exceed it, restrain them.

The same principle is recognized in *Rex.* v. *Lloyd,* 2 *Stra.* 999 ; *Rex.* v. *Whitebread, Doug.* 549 ; *Rex.* v. *Liston*, 5 *D. & E.* 340 ; *Anon.* 1 *Barn. & Adolph.* 382 ; 20 *Com. L. R.* 405 ; (*S. C.*)

*Winter* v. *Lithbridge,* 13 *Price,* 533 ; *McClel.* 253 ; and a great variety of other cases.

In our own state, the same doctrine has always prevailed, that these special proceedings are reviewable by *Certiorari,* for error, or irregularity or excess of jurisdiction, but not on the merits. *State* v. *Chambers, Coxe Rep.* 400 ; *Wood* v. *Executors of Tallman, Ib.* 155 ; *Vunck* v. *Whorl.* 1 *Penn. R.* 335 ; *Ludlow* v. *Ludlow,* 1 *South.* 389. *Independence* v. *Pompton,* 4 *Halst,* 213 ; *Baldwin* v. *Simmons,* 4 *Halst.* 186 ; *Whitehead* v. *Gray,* 7 *Halst.* 36. It is also the doctrine in the State of New York. *Starr* v. *the Trustees of Rochester,* 6 *Wend.* 564. So well settled is this principle, that even in cases, where an appeal is given on the merits, by statute, the writ of *Certiorari* will also lie to review the legal proceedings. *Kingsland* v. *Gould,* 1 *Halst.* 166 ; *Starr* v. *Rochester,* 6 *Wend.* 564. The reason is obvious. The two remedies are totally distinct in their nature and objects. The appeal is not of right, it must be given by statute. The *Certiorari* is of right, and can only be taken away by express enactment. The one appertains to the facts, the other to the law.

But it is asked is there no remedy for excess in damages ? We answer that when the damages are so extravagant as to prove corruption, the assessment can easily be set aside, if the proper course is taken. In any thing short of this, there is no remedy, or if there is, it is not by *Certiorari.* And in this there is no hardship. The Company submitted this matter to a tribunal of their own selection. The act was passed at their instance, and not that of the landholders. It secured an appeal upon the merits, to those who were compelled to part with property against their will. It gave none to the party who took it. The Legislature had a right to make this distinction. It was just and equitable. And by accepting the charter, the Company agreed to it.

It is evident that the positions and rights of the landholder, and the Company, are different, by the act. And it was intended they should be. The one has the right to appeal, given on the merits. The other has not. But if the Company can review the merits of this assessment, by the writ of *Certiorari,* then they can do just what the landholder is permitted to do by the appeal. They can do at common law, what the landholder can only do by the aid of a statute. This is inconsistent.

Where it is intended that the merits of an assessment, shall be looked into by this Court, the power is expressly given ; as in the charter of the Camden and Amboy Rail Road and Transportation Company, sec. 14, *Har. Comp.* 289. There, this Court was authorized to set aside the assessment, upon motion, "for good cause shewn," and send the matter to a jury. The power was exercised by them in two cases. *Bennet* v. *Railroad*, 2 *Green*, 145 ; *Van Wickle* v. *Railroad*, 2 *Green*, 162.

In those cases, writs of *Certiorari* might have been brought to remove the proceedings, on proper grounds. But if brought, would the Court have set aside those assessments, for the same reasons that they did on the motion ? Surely not. And yet that statutory remedy did not abridge the office and power of the writ of *Certiorari.* The remedy was cumulative. And without it the Court would have had no power to look into the merits of the assessment.

By the statute under which the present proceedings have been had, there is no such power given. The plaintiff has come to this Court with a common law writ. He can have no other than the appropriate remedy, and that by the appropriate means. There is a wide difference between the two charters, and the meaning of both is too plain to be mistaken. When the Legislature intend to give an appeal on the merits, it is given in express terms. When it is not given, the writ of *Certiorari* cannot supply the omission, and thus vary the provisions of the charter, and the rights of parties.

III. But another exception is taken to this award. It is said that the Commissioners acted on " erroneous principles."

The specification under this vague charge is, that they allowed more than the present value of the land, and therefore must have made their estimate on some supposed or fanciful, or prospective, or speculative value.

This exception must overcome many difficulties, before it can prevail.

I. This Court cannot know, nor can they ascertain what principle of calculation the Commissioners assumed in making their assessment. The Commissioners are not before the Court. They have not been examined. There was no evidence or testimony adduced before them, on which they were to found their opinion,

and which can be brought here, that the Court may ascertain from it, the correctness of their judgment. They acted on view alone. How then can the Court be informed of the principles on which they made their estimate!

2. If the Court resorts to evidence to show the actual value of the property taken, and damages sustained, it must depend on the opinions of witnesses, and perhaps not the most competent and disinterested. Then it will have the opinions of those witnesses, with which to compare the judgment of the commissioners ; and if they are discrepant, which is to prevail ? The law says, the commissioners shall estimate the compensation. This Court cannot say that their judgment shall be controlled and overcome by the judgment of witnesses. That were to change the tribunal provided by law.

3. But a more serious difficulty remains. The Court can get at the " erroneous principle" of compensation complained of, only by instituting an inquiry into the amount that ought to have been assessed, and comparing it with the assessment actually made. There is nothing on the face of the award, that throws any light on the subject. Every thing must depend on evidence. And what is this, but an investigation of the merits of the award? The very first step to ascertain this pretended " erroneous principle," is to go into an estimate of value and damages. Now this is just what the Court has no authority to do.

The cases cited on the other side, from Wendell, do not support the ground contended for, by the Counsel of the Company. There, the commissioners erred in point of law ; and the cases, prove the position, which is not disputed, that when inferior tribunals act on erroneous principles of law, their proceedings will be set aside. In the one case, the commissioners, in direct contravention of the law under which they acted, neglected to assess the damages, on all the property that should have borne the burden. In the other, the damages were given as for an estate in fee, when the party injured had but a limited interest. These authorities are entirely consistent with an argument, that only legal errors can be corrected by *Certiorari*. In one of the cases, the Court expressly adopted the principle, that when the assessment was made on the right persons, and property, and estate, the Court had no authority to look into the amount. This rule

is universal. There is not a contrary case to be found. In *Starr* v. *Rochester*, before cited, C. J. Savage says, that "the Common law powers of the Court, are confined to the examination of the jurisdiction of such inferior tribunals, and to questions of law arising out of their proceedings, not to an examination of their decisions on questions of fact. Upon such questions, their decision must be final, unless the statute has provided a mode of review."

The argument then, that this Court can examine this award, because the commissioners have acted on "erroneous principles," in the mere mode of calculating damages, is a fallacy. The only erroneous principles that can successfully invoke the corrective power of the Court, sitting simply as a Common law tribunal, are erroneous *legal* principles. In this case, the right person has been awarded compensation for the right property, and the right estate. There is no principle of law involved in the question. The only complaint is that the assessment is too high. If then this assessment can be dealt with by the Court, any other one can be in like manner, when it is too high or too low. And if a difference of opinion between witnesses and commissioners, is to be taken as proof that the latter have proceeded on erroneous principles, then the simple question of damage, is open to the Court, in every case of assessment.

What greater power could the Court exercise, if the right of review by appeal, was given them directly by statute ?

4. If the Court should feel bound to look into the question of damages, the evidence will be found fully to sustain the award.

Ten respectable witnesses from the neighborhood, the most of them long resident in and near the city of New-Brunswick, and well acquainted with this property, have certified as to its value, and as to the damage, the landholder has sustained ; and they have given reasons for their estimate. They say, that this property was more eligibly situated for improvement, than any other adjoining the city. It was directly on the main entrance into the business part of the town. The improvements in the street, on which great part of it was located, were rapidly extending into the heart of the property, rendering it highly valuable. The property is cut diagonally by the Rail road, the base of which was in places, from four to eight feet below the surface

of the ground.    Much of it will have to be cut down and level-led, at a great expense, before it can be used.    They say also, that twenty-one building lots are actually cut through by the Rail-road, and ten others diminished in value, one half.  In mak-ing their estimates, they judge from the location of the property, from recent sales and present prices ; and from these data, they come to the following results :—

1.   James C. Van Dike, estimates the value and damages at    -    -    six thousand five hundred dollars.
2.   Staats Van Deursen, at five thousand eight hundred, do.
3.   James H. Newell, five thousand five hundred & ten, do.
4.   A. Schuyler Neilson,    -    -    five thousand,    do.
5.   Matthew Brown,    -    -    five thousand,    do.
6.   John V. Crawford, (without fencing) five thousand,    do.
7.   Henry Solomon, - six thousand six hundred & ten, do.
8.   Squire Martin,    -    five thousand five hundred do.
9.   James C. Zabriskie, five thousand nine hundred & fifty, do.
10.  Peter R Stelle,    -    -    -    - six thousand, do.

The average estimate of these witnesses, is five thousand six hundred and eighty-seven dollars.    The award, including compensation for fencing, is five thousand eight hundred dollars. Making a difference of only one hundred and thirteen dollars.

This does not savor much of excessive damages.

It is true, a number of witnesses examined on the part of the Company, estimate the property taken, and the landholder's damage, at a much smaller sum.    But they insist on valuing the land by the acre, as though it were plough-land, hence the dif-ference in their conclusion.    If this difference involves any prin-ciple of law on which the Court can rest, I am unable to per-ceive it.

The commissioners arrived at the same result as the ten wit-nesses did, who subsequently testified on the part of the landhol-der.    What mode of computation they adopted we do not, and cannot know, but as it coincides with the honest judgment of ten respectable citizens, it cannot be far out of the way.

If any thing can make manifest the impropriety of entertain-ing this *Certiorari*, it is the aspect of the case, as now presented. Upwards of twenty witnesses have been sworn, and volumes of testimony taken in regard to the value of this property, and the

damages sustained. And for what object? merely to ascertain whether the assessment is or is not right, in point of amount, and how the commissioners made their calculation. What is this but an enquiry into the merits?

There is nothing to sustain the suit, and it should be dismissed.